UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

REBECCA FRANCIS,
    Plaintiff,

vs

MICHAEL J. ASTRUE
COMMISSIONER OF SOCIAL SECURITY,
    Defendant.

Case No. 1:07-cv-373
(Beckwith, J.)
(Hogan, M.J.)

## REPORT AND RECOMMENDATION

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of Social Security (Commissioner) terminating plaintiff's disability insurance benefits (DIB). This matter is before the Court on plaintiff's Statement of Errors (Doc. 7), the Commissioner's response in opposition. (Doc. 10), Plaintiff's Reply to Defendant's Memorandum in Opposition (Doc. 11), and the administrative record.

## PROCEDURAL BACKGROUND

Plaintiff, Rebecca Francis, was born on July 12, 1960, and was a younger person on the disability cessation date and a person closely approaching advanced age when her DIB insured status ended on December 31, 2001. Plaintiff has a Bachelor's degree and past work experience as a accounts payable clerk, a paralegal, a receptionist/file clerk and an accounting clerk. Plaintiff filed her application for DIB on April 23, 1996, and was found disabled. Plaintiff's disability status was subsequently reevaluated, and her disability ended January 1, 2001, based on the determination of January 16, 2001. Plaintiff requested reconsideration, but it was determined her disability had ended. Plaintiff requested and was granted a de novo hearing before an ALJ. On April 22, 2003, plaintiff, who was represented by counsel, appeared and testified at a hearing

before ALJ Deborah Smith. Supplemental hearings were held November 18, 2003, February 3, 2004, July 29, 2004 and December 22, 2004.

## PLAINTIFF'S TESTIMONY AT THE HEARING

Plaintiff testified at the April 22, 2003 hearing that since placed on disability, she worked at a law firm, but the job lasted only seven days (Tr. 815). She also worked some temporary jobs, but she was let go after about three days (Tr. 820-21). She still had problems with depression, but pain in her upper back and left arm was more of a problem (Tr. 815). She last saw her primary care physician six months prior to this hearing and had seen him a couple of times in the past year and a half. (Tr. 815, 819). Plaintiff saw her counselor, Sue Sessum, for depression. (Tr. 816). Her medications at that time included Wellbutrin, Hydrocodone and Baclofen. (Tr. 818).

Plaintiff testified at the April 3, 2004 hearing that her pain was in her neck, upper back, shoulder, and left arm. (Tr. 836). The pain was generally a burning sensation, but depending on activity level, the pain can become much more intense. Her arm can become highly sensitive to touch."It can be just the – even like the wind blowing sometimes and it feels like a, a heavy weight is going through my arm, and that can set off my tic disorder." Id. Repetitious movements, and keeping her hand still for 20 minutes, aggravated her pain. (Id.). She had no limitations on driving. (Tr. 832). She used ice and Vicodin to relieve her pain. (Tr. 836, 383).

Plaintiff saw her counselor every three weeks and took Wellbutrin for depression, which also relieves pain. (Tr. 842). In addition to the Vicodin and Wellbutrin, she took Baclofen and Aleve (Tr. 844). Plaintiff further testified that her tic disorder was minor at times, but it could be triggered by a lot of pain, a lot of stress, lights, brilliant colors, or strange odors. (Tr. 840-41). The jerking neck movements of her tics aggravated the pain in her arm. (Tr. 841). Plaintiff testified that she also had neck pain if she sat for long periods. (Tr. 841). After sitting 30 to 45 minutes, she needed to walk around. (Tr. 842). She always had pain in her left hand, but it would intensify if she read for 20 to 30 minutes. (Tr. 843). She thought that her depression and her neck and upper extremity problem had remained about the same. (Tr. 848).

Plaintiff had completed her bachelor's degree requirements in May 2002. (Tr. 832).

2

Except for one term, she had been able to arrange it so her classes were every other day. (Tr. 838). During the term when she had class everyday, she went home and reclined between classes. (Tr. 838). Some classes lasted an hour, but her paralegal classes lasted at least 2 ½ hours with a break. (Tr. 843). She was able to type for about 30 minutes at a time, but she used voice recognition software to write her papers. (Tr. 838-39). After graduating, she worked as a part-time receptionist/bookkeeper at Metro Recycling for a while. (Tr. 833, 837). It was a sitting job, but she was able to get up and walk around to deliver things and to file. (Tr. 833).

Plaintiff testified about her daily activities, which included reading, watching court TV shows and football, looking for a job, and keeping her ill mother company. (Tr. 845-46). She had dinner with friends once or twice a month. (Tr. 847).

## THE VOCATIONAL EXPERT AND THE HYPOTHETICAL QUESTION

Vocational expert (VE) Robert Breson, testified at the December 22, 2004 hearing. (Tr. 889-910). He testified about Plaintiff's past relevant work as a receptionist and described it as sedentary and semi-skilled. The file clerk work was described as light and semi-skilled and the accounts payable clerk and accounts collectible clerk jobs were both classified as sedentary and skilled. The litigation paralegal was described as light and skilled. The VE testified that his opinion was consistent with the *Dictionary of Occupational Titles* and his experience. The skills acquired in the paralegal and accounting jobs would be transferable to sedentary work, but filing would generally be light work. (Tr. 895).

The ALJ's hypothetical question to the VE assumed an individual with good relationships with fellow workers and supervisors, could understand, remember and follow most instructions, able to concentrate and pay attention, normal pace and persistence, ability to withstand job stress limited by compromised energy level and neck and arm pain. The VE responded that such a person could do all of Plaintiff's past jobs.

When asked to assume the mental capacity articulated by the state agency psychologist at Exhibit 19F and the physical limitations stated by Dr. Sheridan at page two of Exhibit 37F, the VE testified that such a person could perform Plaintiff's past relevant work, as that work is

generally performed at the sedentary level. The VE agreed that a person who could not repetitively or constantly use the upper extremities, could not perform overhead work, could not perform frequent pushing or pulling, and needed a sit/stand option, could still perform the sedentary jobs of receptionist and paralegal, although the need for a sit/stand option would reduce the number of receptionist jobs by 75%. The need to get up and walk around every 30 minutes would not affect the paralegal job, but it would affect the receptionist job if the worker had to walk away from her work station.

When posed with limitations precluding highly complex tasks and work with the general public, the VE testified that such limitations would preclude the receptionist job, but it would not preclude the file clerk job.

## THE ADMINISTRATIVE DECISION

On January 24, 2005, the ALJ issued a decision confirming that plaintiff's DIB were properly ceased on January 1, 2001. The ALJ determined that plaintiff suffers from the severe impairments of depression, anxiety, pain disorder, left arm pain, neck pain, and a tic disorder, but that such impairments do not alone or in combination meet or equal the level of severity described in the Listing of Impairments. (Tr. 34, ¶¶ 3, 5). The ALJ determined that Plaintiff had experienced medical improvement in her tic disorder and depression since the comparison point decision, and this improvement related to her ability to work. (Tr. 34, ¶ 4). The ALJ determined that Plaintiff's allegations of total disability were not credible. (Tr. 34, ¶ 6). According to the ALJ, Plaintiff retains the residual functional capacity (RFC) for medium work, except she is limited to occasionally climb, crouch, or crawl. She retains the ability to understand, carry out, and remember simple instructions, to respond appropriately to supervision, coworkers, and usual work situations, and to deal with changes in a routine work setting. (Tr. 34, ¶ 7). The ALJ determined that Plaintiff could return to her past relevant work as a receptionist/file/billing clerk. (Tr. 34 ¶ 8). Consequently, the ALJ concluded that plaintiff was not disabled under the Act.

Plaintiff requested review by the Appeals Council. The Appeals Council denied Plaintiff's request for review, making the decision of the ALJ the final administrative decision

4

of the Commissioner.

## APPLICABLE LAW

The following principles of law control resolution of the issues raised in this case. Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. The Commissioner's findings stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

A recipient of disability bears a continuing burden to show that he or she is disabled. *See, Mathews v. Eldridge,* 324 U.S. 319, 336 (1976); *Cutlip v. Secretary of Health and Human Services*, 25 F.3d 284, 286 n.1 (6th Cir, 1994). A recipient of disability benefits will be found to be no longer disabled if there has been medical improvement in his or her impairments since the time of the most recent favorable determination, other than improvement that is not related to the recipient's ability to work and the recipient is not able to engage in substantial gainful activity. *See,* 42 U.S.C. §423(f). In determining whether a recipient's entitlement to disability benefits has ended, the Commissioner uses an eight-step sequential evaluation process. *See,* 20 C.F.R. §404.1594(f)(1)-(8); *see also, Johnson v. Secretary of Health and Human Services,* 948 F.2d 989, 991 (6th Cir. 1991). That the claimant currently not be engaged in "substantial gainful activity," is the first step in the sequential evaluation process for determining that disability has ended. *See, Id.* The other steps can summarized as follows: (2) If not engaged in substantial gainful employment, does the recipient have an impairment which would result in a new finding of disability? (If yes, the disability is found to be continuing.). (3) If no, has there been medical improvement in the condition which was originally found to be disabling? (If no, the disability is usually found to continue). (4) If there has been medical improvement, is it related to the ability

5

of the recipient to do work? (If no, disability is probably found to be continuing, subject to step 5). (5) This step contains the exceptions to continuing disability even when no medical improvement is found in step 3 or the improvement is not related to ability to do work in step 4. (6) If medical improvement is shown, is the recipient's current impairment nonetheless severe? (If no, disability ceases). (7) If the current impairment is severe, can the recipient do the work which he did before determined to be disabled? (If yes, the disability ceases). (8) If the recipient cannot do the work done in the past, can the recipient do other work?

Regulations promulgated by the Commissioner establish a sequential evaluation process for disability determinations. 20 C.F.R. § 404.1520. First, the Commissioner determines whether the individual is currently engaging in substantial gainful activity; if so, a finding of nondisability is made and the inquiry ends. Second, if the individual is not currently engaged in substantial gainful activity, the Commissioner must determine whether the individual has a severe impairment or combination of impairments; if not, then a finding of nondisability is made and the inquiry ends. Third, if the individual has a severe impairment, the Commissioner must compare it to those in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment meets or equals any within the Listing, disability is presumed and benefits are awarded. 20 C.F.R. § 404.1520(d). Fourth, if the individual's impairments do not meet or equal those in the Listing, the Commissioner must determine whether the impairments prevent the performance of the individual's regular previous employment. If the individual is unable to perform the relevant past work, then a prima facie case of disability is established and the burden of going forward with the evidence shifts to the Commissioner to show that there is work in the national economy which the individual can perform. *Lashley v. Secretary of H.H.S.*, 708 F.2d 1048 (6th Cir. 1983); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). Plaintiff has the burden of establishing disability by a preponderance of the evidence. *Born v. Secretary of Health and Human Servs.*, 923 F.2d 1168, 1173 (6th Cir. 1990); *Bloch v. Richardson*, 438 F.2d 1181 (6th Cir. 1971). Once plaintiff establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that plaintiff can perform other substantial gainful employment and

that such employment exists in the national economy. *Harmon v. Apfel*, 168 F.3d 289, 291 (6th Cir. 1999); *Born*, 923 F.2d at 1173; *Allen v. Califano*, 613 F.2d 139 (6th Cir. 1980). To rebut a prima facie case, the Commissioner must come forward with particularized proof of plaintiff's individual capacity to perform alternate work considering plaintiff's age, education, and background, as well as the job requirements. *O'Banner v. Secretary of H.E.W.*, 587 F.2d 321, 323 (6th Cir. 1978). *See also Richardson v. Secretary of Health & Human Services*, 735 F.2d 962, 964 (6th Cir. 1984)(per curiam). Alternatively, in certain instances the Commissioner is entitled to rely on the medical-vocational guidelines (the "grid") to rebut plaintiff's prima facie case of disability. 20 C.F.R. Subpart P, Appendix 2; *O'Banner*, 587 F.2d at 323. *See also Cole v. Secretary of Health and Human Services*, 820 F.2d 768, 771 (6th Cir. 1987).

A key question in this case is the severity of Plaintiff's impairments before the expiration of her insured status. A social security disability claimant bears the ultimate burden of proof on the issue of disability. *Richardson v. Heckler,* 750 F.2d 506, 509 (6th Cir. 1984)(citation omitted). The claimant's specific burden is to prove that he was disabled on or before the last date on which he met the special earnings requirement of the Act. *Id.* (citation omitted); *Moon v. Sullivan,* 923 F.2d 1175, 1182 (6th Cir. 1990). Post insured status evidence of a claimant's condition is generally not relevant. *Bagby v. Harris,* 650 F.2d 836 (6th Cir. 1981); *see also, Bogle v. Secretary of Health and Human Services,* 998 F.2d 342 (6th Cir. 1993). However, such evidence will be considered if it establishes that an impairment existed continuously and in the same degree from the date the insured status expired. *Johnson v. Secretary of Health and Human Services,* 679 F.2d 605 (6th Cir. 1982). Plaintiff's insured status expired on December 31, 2001. Therefore, Plaintiff must establish that she became disabled on or before that date.

Where a claimant suffers from an impairment limiting only his strength, the Commissioner can satisfy his burden, without considering direct evidence of the availability of jobs the particular claimant can perform, through reference to the Grid. *Abbott v. Sullivan,* 905 F.2d 918, 926 (6th Cir. 1990). The Grid aids the Commissioner in determining disability claims by allowing "administrative notice" to be taken of the existence of jobs in the national economy that those with particular combinations of the four statutory factors are capable of performing. *Id, citing, Kirk v. Secretary of Health and Human Services,* 667 F.2d 524, 529 (6th Cir. 1981),

7

*cert. denied,* 461 U.S. 975 (1983). The Grid is composed of sections numbered 201.01 through 203.31, each of which specifies whether a claimant with a particular combination of the four factors listed in the Act will be found disabled or not disabled. *See, Id.* The Grid takes into account only a claimant's exertional impairment; that is, one which manifests itself by limitations in meeting the strength requirements of jobs. *Abbott, supra.* (citation omitted). Where a claimant suffers from an impairment that significantly diminishes his capacity to work, but does not manifest itself as a limitation on strength, rote application of the Grid is inappropriate. *Id.* (citations omitted). In the case of an individual who suffers from both exertional and nonexertional impairments, where the Grid does not yield a finding of "disabled" when the exertional impairments are considered alone, the Grid may be employed as a "framework" to provide guidance. *Id.* (citations omitted). With respect to exertional impairments, the correct disability decision is found by locating the claimant's specific vocational profile within the Grid sections. *See,* 20 C.F.R. Pt. 404, Subpt. P, App. 2 §200.00.

It is, of course, the Commissioner's function to weigh the evidence. *Young v. Secretary of Health and Human Services,* 787 F.2d 1064 (6th Cir.), *cert. denied,* 479 U.S. 990 (1986). Social Security matters not uncommonly involve the situation of conflicting medical evidence and the trier of fact has the duty to resolve that conflict. *Cf., Richardson v. Perales,* 402 U.S. at 399; *see also, Mullins v. Secretary of Health and Human Services,* 836 F.2d 980 (6th Cir. 1987).

The regulations expressly provide that the responsibility for deciding a claimant's residual functional capacity rests with the Administrative Law Judge when cases are decided at an administrative hearing. *Webb v. Commissioner of Social Security,* 368 F.3d 629, 633 (6th Cir. 2004)(citations omitted). [20 C.F.R. § 404.1546; § 404.1527(e)(2)].

## OPINION

The pertinent medical findings and opinions have been adequately summarized by the parties in their briefs and will not be repeated here. Where applicable, the Court shall identify the medical evidence relevant to its decision.

Plaintiff assigns several errors in this case. First, Plaintiff contends that the ALJ's finding

8

that Plaintiff could perform her past work, which the VE described as semi-skilled to skilled, was inconsistent with the ALJ's RFC finding limiting Plaintiff unskilled work, that is, work involving simple instructions. Second, Plaintiff argues that the ALJ erred in affording more weight to the reviewing physician rather than the consultative examining physician with respect to Plaintiff's pain. Plaintiff also contends that the ALJ's mental RFC is not supported by substantial evidence and the ALJ erred in failing to consider her the combination of her impairments.

From a physical standpoint, the most relevant medical evidence came from the consultative examinations performed by Mary E. Johnson, M.D. on December 19, 2000 (Tr. 531-38) and Richard T. Sheridan, M.D. on July 17, 2003. (Tr. 590-96).

When examined by Dr. Johnson, Plaintiff's memory, ability to relate, and intellectual functioning all appeared normal. She walked with a normal gait and used no ambulatory aid. Dr. Johnson observed no tics. Plaintiff complained of pain with upper extremity range of motion maneuvers of the cervical spine as well as pain with light palpation of the upper thoracic/parathoracic spine. Plaintiff reported she took Vicodin as needed for pain. Examination revealed no atrophy or spasm. Reflexes and sensation were intact, and motor strength was 5/5 throughout. Straight leg raising was slightly decreased, but lumbar and lower extremity motion was normal. Cervical flexion and extension were decreased, but right and left rotation were full grasp, manipulation, pinch, and fine coordination were normal, and upper extremity motion was normal. A cervical spine x-ray showed narrowing at C5-C6 and surgical changes. Dr. Johnson diagnosed degenerative disc disease of the cervical spine, status post cervical spine fusion, extreme sensitivity of the upper thoracic spine and left arm, and possible radiculopathy of the left upper extremity. Dr. Johnson opined that Plaintiff's ability to perform work-related activities, including walking, standing, stooping, bending, lifting, and carrying was moderately diminished.

When Dr. Sheridan examined Plaintiff, she complained of left arm pain, neck pain, left knee pain and a tic. She told Dr. Sheridan that the frequency of her tics was diminished with Baclofen, but her tics tended to occur when her cervical spine or extremities were touched. She took Naproxen for pain. Dr. Sheridan noted that Plaintiff walked with a normal gait with no ambulatory aids, stood, sat, and arose from a chair normally, and was able to toe and heel walk, get on and off the examination table without help, and reach fully overhead with each arm.

9

Plaintiff was right-hand dominant and had adequate manipulation, pinch, and fine coordination bilaterally. Reflexes were symmetric, sensation was normal, and there were no motor deficits, but Plaintiff had moderate para-cervical spasm and her arm and thigh measurements were less on the left than on the right. There was no twisting of the neck, cervical tenderness, or limitation of upper extremity motion. Cervical flexion and extension were slight decreased. Lumbar and lower extremity ranges of motion were full, and straight leg raising was negative, There was moderate swelling, crepitus, and synovitis of the left knee. Dr. Sheridan observed tics during the examination, when he touched her cervical spine and left arm. Dr. Sheridan diagnosed Plaintiff with involuntary tic; status-post C5-C6 discectomy and fusion with no ongoing radiculopathy; residual left upper extremity discomfort, with no motor, sensory, or reflex changes; and status-post two surgeries on the left knee with some residual signs of patellofemoral arthrosis. Dr. Sheridan opined that Plaintiff could do sedentary work. (Tr. 590-600).

Dr. Sheridan also completed a questionnaire, opining that Plaintiff could lift/carry ten pounds occasionally and less than ten pounds frequently, stand and/or walk less than two hours in an eight-hour workday, and sit less than six hours in a workday. Plaintiff should not climb, balance, kneel, crouch, crawl, or stoop. Plaintiff had limitations on exposure to vibrations and hazards. (Tr. 601-604).

When asked to clarify, Dr. Sheridan wrote a letter on August 4, 2003, stating that Plaintiff could occasionally lift and pull ten pounds, stand and/or walk about six hours in an eight-hour workday, and sit about six hours in a workday, but she could not climb, balance, kneel, crouch, crawl, or stoop. Plaintiff had no restrictions on her ability to reach, handle, finger, or feel, and no visual or communicative limitations, but she should not be exposed to heights or operate or be exposed to heavy machinery or engage in activities with her upper extremities that would involve vibrations. (Tr. 674).

> The ALJ stated in her opinion,
>
> In making this assessment, the undersigned must consider all symptoms, including pain, and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence based on the requirements of 20 CFR § 404.1529, and Social Security Ruling 96-7p. The undersigned must also consider any medical opinions, which are statements from acceptable medical sources, which reflect judgments about the nature and severity

10

> of the impairments and resulting limitations. (20 CFR § 404.1527 and Social Security Rulings 96-2p and 96-6p).
>
> Dr. Sheridan opined the claimant can do "sedentary" work. He said she can lift up to 10 pounds occasionally, stand and/or walk up to 2 hours per 8-hour day, and sit less than 6 hours per 8-hour day. He said she can never climb, balance, kneel, crouch, crawl, or stoop (Exhibit 23F, page 13). On the other hand, he said she could do unlimited reaching, handling, fingering, and feeling (Exhibit 23F, p. 14). Clearly, Dr. Sheridan's clinical findings, his bare conclusion that the claimant can do "sedentary" work, and his residual functional capacity assessment all contradict one another. I find that I cannot rely on Dr. Sheridan's conclusions for this reason.
>
> Two non-examining medical consultants opined the claimant can do at least medium work with occasional climbing, crouching, and crawling (Exhibit 17F). In support of this opinion, the physicians noted the claimant currently has no numbness and tingling in the arms, a normal neurological examination, decreased range of motion of the neck, and normal sensation. One physician said the claimant is exaggerating her pain, and that the clinical findings are not consistent with the claimant's complaints (Exhibit 17F). The non-examining medical consultants' opinions, and the bases underlying them, are consistent with the evidence. The claimant's neck and arm problems warrant some restriction in her residual functional capacity, but the evidence overwhelmingly suggests that the claimant is quite capable of doing a wide range of physical activity.

(Tr. 31-32). Plaintiff argues that the ALJ failed to apply Social Security's own rules and regulations for the evaluation of medical source opinion. However, Plaintiff correctly noted that there is no treating physician opinion to which controlling weight can be given. Nonetheless, the opinions of non-examining state agency medical consultants have some value and can, under some circumstances, be given significant weight. This occurs because the Commissioner views nonexamining sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." Social Security Ruling 96-6p. Their opinions, however, are weighed under the same factors as treating physicians' opinions including supportability, consistency, and specialization. *See* 20 C.F.R. §§404.1572(d), (f), 416.927(d), (f).

Plaintiff has not demonstrated that the ALJ applied incorrect standards of law when evaluating the medical source opinions. *See* Doc. 7 at 12-15; Doc. 11 at 3-4. She contends, however, that by the ALJ's reliance on the opinions of the non-examining State agency

11

physicians who reviewed the file in 2001, the ALJ did not apply the factors described in the regulations concerning the weight to give these opinions, or describe how these opinions, were somehow more reliable than Dr. Sheridan's opinion.

The ALJ did not err by concluding that Dr. Sheridan's extreme opinion was not entitled to controlling weight because it was not adequately supported and was inconsistent with the other reliable evidence in the record. Additionally, Dr. Johnson's opinion does not support Dr. Sheridan's opinion, rather, it supports the medium RFC finding by the ALJ. Dr. Johnson's finding of no atrophy or spasm contradicts Dr. Sheridan's report. Dr. Johnson and Dr. Sheridan both note that Plaintiff walked with a normal gait and needed no ambulatory aids and had intact reflexes and sensation, full motor strength in all muscle groups, full ranges of lumbar, lower extremity, and upper extremity motion. (Tr. 531-32, 537-38). As the ALJ noted, Dr. Johnson's opinion that Plaintiff's capacity for lifting and carrying were moderately diminished is not quantified and does not support Plaintiff's contention that she is capable of no more than sedentary work.

Plaintiff's family physician, Dr. Wones, noted that Plaintiff had a fair range of neck motion and no neurological deficits. (Tr. 636).

State agency physician, Robert A. Weisenburger, M.D., reviewed the medical evidence of record in January 2001 and concluded Plaintiff could do the full range of medium work. (Tr. 767-94). Similarly, in October 2001, state agency physician, Jung Huh, M.D., reviewed the medical evidence of record and also opined that Plaintiff could do medium work with occasional climbing. (Tr. 796-803).

Under those circumstances, the Court concludes that the ALJ both had an adequate basis for discounting Dr. Sheridan's findings and articulated such adequate bases in her decision.

Turning to Plaintiff's mental impairment, the ALJ concluded,

> To determine whether the claimant's medically determinable mental impairments are "severe," I must rate the degree of functional limitation resulting from the impairments in four areas of functioning: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.
>
> Activities of daily living generally encompass general adaptive activities such as cleaning, shopping, cooking, taking public transportation, driving an automobile,

paying bills, maintaining residence, caring appropriately for grooming and hygiene, using telephones, using simple household appliances, using small tools, and other self-care activities. (Listing of Impairments, § 12.00 (C) (l)). The claimant said told Dr. Schmidtgoessling she could dust, make beds, wash dishes, do laundry (with some trouble folding clothes and pulling items out of the machine), go shopping with her daughter, drive, and maintain her hygiene, and she usually could manage her money and medication. Site said she did not cook, lift heavy items, or do yard work (except for using the riding mower). She said, also, that on a typical day she would rise at 7:00 am. and spend 70% of her time on schoolwork. She said she would spend much of the week at school, going to classes anytime from 11:30 a.m. to 9:30 p.m. (Exhibit 13F, page 2). The claimant also provided a quite revealing handwritten statement, signed only one month prior to her appointment with Dr. Schmidtgoessling (Exhibit 10E). In it, she reported she could do laundry a few pieces at a time spaced out over the week, put dishes away (favoring her right arm and relying on her daughter for help), use a dishwasher, and do grocery shopping once a month and weekly for staples (although she reportedly avoided malls because the stimulation aggravated her tics, and walking for so long aggravated the pain in her arm and neck). She reported she could make her own meals, cooking 3-4 times per week, sometimes with her daughter's help. Rather than the TV dinners or sandwiches she told Dr. Schmidtgoessling she would make, the claimant reported making grilled chicken or beef, potatoes, vegetables, spaghetti, and fried eggs. She said she had difficulty with the sweeping motions of a vacuum or broom and any repeated movement with her arms, such as ironing, folding clothes, or washing windows (Exhibit 10E, page 5). The claimant said she would read every day during the school year for a couple of hours total, for about 30 minutes at a time, with special positions to relieve pain in her arm. She said she also was attending class for about 24 hours weekly, and although she could sit through an hour long class with some difficulty, she would get uncomfortable if she tried to drive for more than 30 minutes. The claimant additionally reported she would watch television or a movie, but only for a few hours per day because the television could set off her tics. She said she had no hobbies, but she would exercise 30 minutes per day 3 days a week and 20 minutes per day 2 days per week to relieve high blood pressure, reduce stress, and stay healthy. The claimant said only one thing regarding the effect of depression on her daily activity: "depression sometimes interferes even with taking an antidepressant" (Exhibit 10E, p. 9). However, in November 200 I, the claimant told Dr. Heideman she was taking *eight* classes! (Exhibit 18F, p. 3). She told him she would rise at 6:00 am. and bathe, dress, and eat. She would then read an affirmation or two. She said sweeping and vacuuming were "not a good idea," but she would carry the laundry. She reported problems with repetitive motion. (Exhibit 18F, p. 4).

(Tr. 28-29).

The ALJ continued her evaluation of Plaintiff's mental impairment,

> A non-examining medical consultant opined, partly in response to Dr. Heideman's evaluation, that due to depression the claimant had mild restriction of activities of daily living and moderate restriction of her social functioning and her concentration, persistence, or pace (Exhibit 19F). I must note, however, that the claimant has not complained of concentration problems, and she clearly could focus and concentrate, given the overload of courses she was taking. She reported having friends and engaging in some social activities, both with her family and her friends. She reported repeatedly that her social activities were limited by her busy schedule, not by depression. The claimant's daily activities, where limited at all, appear limited mostly by her alleged pain. She did mention that depression interferes with taking an antidepressant, but she also said that she usually manages her medication well. Yet another example of the claimant's high level of functioning is Exhibit 35F, containing the claimant's grade reports. I find it remarkable that the claimant would allege mental or physical disability, given that she attended 8 terms of school while caring for her mother, her home, and her children - and never made a grade below a "B." The claimant made mostly A's, in fact, and made 8 A's the term she took 8 classes in 2003! The evidence clearly supports a finding that the claimant's mental impairments are "less than severe." Nonetheless, I will give the claimant the benefit of the doubt and accept the opinion of non-examining medical consultant R. Kevin Goeke, Ph.D., who opined the claimant's mental impairments cause mild limitation in activities of daily living and moderate limitation in social functioning and concentration, persistence, or pace. I reject the opinion of J. Rod Coffman, Ph.D., who opined the claimant's mental impairments cause her no more than mild limitations in her activities of daily living, social functioning, and concentration, persistence, or pace.

(Tr. 30). The ALJ based her determination of Plaintiff's mental residual functional capacity on page 18 of the form completed by Dr. Goerke (Tr. 561), page 4 of Dr. Schmidtgoessling's report (Tr. 516), "and the overall record concerning the claimant's daily activities, social interaction, and ability to concentrate. (Tr. 32). The ALJ rejected Dr. Heideman's opinion. Dr. Heideman concluded that Plaintiff was not considered reliable or retainable, yet he observed that Plaintiff would have good relations with fellow workers and supervisors, could understand, remember, and carry out most instructions, and had no trouble with concentration. (Tr. 22, citing Tr. 543). The ALJ also noted that Dr. Heideman assigned Plaintiff a GAF of 61, indicating no more than mild symptoms or mild difficulties in social and occupational functioning. *Id.* These findings further support the ALJ's mental residual functional capacity finding.

14

Plaintiff further argues that the ALJ did not properly assess the opinion of her treating therapist, Sue Sessum, LISW. Plaintiff states the ALJ "gave only a passing nod to the opinion of Ms. Sessum." (Doc. 7 at 17). SSR 06-03p essentially provides that while the factors set forth in 20 C.F.R. §§ 404.1427(d) and 416.927(d) apply only to evaluating medical opinions from acceptable medical sources, the same factors can be applied to opinion evidence from other sources. A review of the ALJ's decision at pages 27 and 28 reveal that the ALJ throughly analyzed Ms. Sessum's treatment records and opinion.

Because the ALJ applied the correct legal criteria to her evaluation of the medical source opinions of record, and because substantial evidence supported her evaluation of these opinions, the ALJ reasonably concluded that Plaintiff could perform a range of medium work. Although Plaintiff certainly disagrees with the ALJ's weighing of the evidence, the ALJ's decision was within the zone of reasonable choices. *See Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986) ("The substantial evidence... presupposes that there is a zone of choice within which the decision makers can go either way, without interference by the courts.").

Lastly, Plaintiff contends that the ALJ did not accurately describe her limitations to the vocational expert and therefore should not have relied on that expert's testimony concerning performance of her past relevant jobs. Plaintiff argues that the vocational experts were never asked whether Plaintiff could perform her past relevant work if she were limited to "unskilled" work.

The Court finds, under the deference owed to the ALJ's decision, that the ALJ did not err in finding that Plaintiff could perform a limited range of medium work. Because the FRC assessment and credibility findings of the ALJ are supported by substantial evidence, the hypothetical posed by the ALJ, which incorporated that assessment and those findings, was not improper. Accordingly, the administrative law judge did not err in relying on the testimony of the vocational expert. *See Varley v. Secretary of Health and Human Services,* 820 F.2d 777, 779 (6th Cir. 1987).

As noted above, in *Varley*, the Sixth Circuit held that a VE's answer to a hypothetical question could be substantial evidence supporting the Commissioner's decision to deny benefits if that question accurately portrays all of the claimant's physical and mental limitations. 820

F.2d at 779. In the present case, the ALJ indicated that Plaintiff is limited to occasionally climb, crouch, or crawl. She retained the ability to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting. (Tr. 34, ¶ 7). Therefore, in order for the VE's answers to the hypothetical questions to have been substantial evidence in support of the Commissioner's decision to confirm the termination of plaintiff's DIB, it must have accurately portrayed those limitations. As long as Plaintiff's limitations are accurately portrayed, there is no requirement that a hypothetical question use the precise language of the limitations. *Beecroft v. Secretary of Health and Human Services,* No. C-3-94-025 (S.D.Ohio Mar. 6, 1995)(Rice, C.J.).

The Court notes that under the continuing disability review process, the record supports the fact that Plaintiff's tic disorder and depression have improved. In properly analyzing all medical source opinions, the ALJ found Plaintiff has a residual functional capacity to perform work at the medium level.

Nowhere in Plaintiff's statement of errors does she object to the ALJ's finding of medical improvement. Also, as argued by the Commissioner, assuming the ALJ erred in finding Plaintiff could do her past work as a receptionist, such error was harmless because the evidence establishes that Plaintiff nevertheless had the capacity to perform a significant number of jobs in the economy and, therefore, she was no longer disabled. A person who can perform medium work is also considered capable of performing light work and sedentary work. 20 C.F.R. § 404.1567(c). Under the Medical-Vocational Guidelines, 20 C.F.R. Subpart P, Appendix 2, § 202.14 and 202.21, the Plaintiff would be found not disabled.

## CONCLUSION

Our duty on appeal is not to re-weigh the evidence, but to determine whether the decision of the Commissioner is supported by substantial evidence. *See, Raisor v. Schweiker,* 540 F.Supp. 686 (S.D.Ohio 1982). The evidence "must do more than create a suspicion of the existence of the fact to be established. ... [I]t must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury."

*LeMaster v. Secretary of Health and Human Services,* 802 F.2d 839, 840 (6th Cir. 1986), *quoting, NLRB v. Columbian Enameling & Stamping Co.,* 306 U.S. 292, 300 (1939). The Commissioner's decision in this case is supported by such evidence.

It is THEREFORE RECOMMENDED THAT the Commissioner's decision, that Plaintiff has medically improved and is not presently disabled and therefore not entitled to continuing benefits under the Act, be AFFIRMED.

Date: September 30, 2008

/s/ Timothy S. Hogan
Timothy S. Hogan
United States Magistrate Judge

### NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO THIS REPORT & RECOMMENDATION

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to these proposed findings and recommendations within TEN DAYS after being served with this Report and Recommendation. Pursuant to Fed. R. Civ. P. 6(e), this period is automatically extended to thirteen days (excluding intervening Saturdays, Sundays, and legal holidays) because this R&R is being served by mail. That period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party may respond to another party's objections within TEN DAYS after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters,* 638 F. 2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).

C:\Documents and Settings\hillaw\Local Settings\Temp\notes721D2D\~6306728.wpd